Today is case number 151978, the Do Corporation v. Shastany et al. Good morning, your honors. I may it please the court, Anthony Wilson representing the Do Corporation and Daniel Silva. I'd like to reserve one minute of my time for rebuttal. Yes. Your honor, I'd first just like to start by stating that this is the case about the revocation of a liquor license for Daniel Silva, who was the sole operator of the Do Corporation, which operated the Whiplash nightclub. The appellants assert that the lower court overstepped its bounds when it granted the defendant's motion for summary judgment. And the appellants assert that there is two main reasons for this. The first, relative to the appellant's First Amendment argument that they were denied equal protection under the law, the court correctly cited to the standard articulated in Pagan v. Calderon, the two-step analysis that starts with the first determination whether there was differential treatment based on either invidious discrimination, abuse of power, or some other fundamental procedural unfairness, and whether they were treated differently than similarly situated organizations. I want to, because I think it makes more sense, I'm going to just work backwards from the second argument, which is about the differential treatment based on invidious discrimination to the argument or to the element of similarly situated. Regarding the element of differential treatment based on invidious discrimination, there is ample evidence in the record that during the hearing in which the board decided to revoke the appellant's liquor license, there was excessive or at least undue focus on the types of individuals and the types of music that the appellant was playing or performing at his establishment. There was only one witness, and it was the witness who was present at the club that evening, and he described what happened on the night of the shooting that purportedly led to this revocation. I want to recur to that. The purpose of the hearing and the powers of the board are delineated by the state's liquor licensing law, and the state determines specifically what types of violations and what type of obligations the license holder, in this case the appellant, has to uphold. And those are, in this case, the board ultimately, while its position evolved, ultimately landed on saying that there was some illegality permitted on the premise of the liquor license establishment. Again, the liquor license establishment was only the interior of the Whiplash Nightclub, and based on the testimony of one officer who testified about the incident that they were having the hearing about, he stated that they had security. He stated that they had, on that night and on several other nights, had the appropriate level of police, extra police officers that the town had wanted them to have, and that when any individual engaged in any inappropriate behavior, that security and the officer would eject those individuals from the nightclub. That officer also testified that the shooting happened in a parking lot that is adjacent to the club but not under the control of the licensee, and therefore there was no grounds to, there were no factual, there were no facts that the license holder did anything contrary to his license. There was also no testimony. Mr. Wilson, it seems that all of your arguments, as we trace them through, ultimately come back to the fit of your comparators in terms of suggesting that this club was treated differently than other similarly situated clubs, and the court below found that it was basically apples and oranges, and the evidence was sufficient that at your client's apple there was, there were violent incidents, there were police calls and the like. I was going to get to you on that. Let me move ahead more quickly. The purpose of discussing what happened at the hearings is to say that, again, this was the only violation hearing for this club. There is no violation under the statute that can hold a club liable for some series of incidents. Under the case law and under the CMRs, you have to find liability for each individual incident. Why am I discussing that with your honors? Because I know that Pagan B. Calderon says that you're not, you don't care about whether or not the court got it right or did the right procedure, but about whether some fundamental right was violated, is that when discussing the comparators, the lower court incorrectly ascribed certain events to the Whiplash Nightclub that were not the fault or that did not come under the rubric of the regulations of the state. Again, when discussing comparators, this case has been very clear in Horty v. Allen. It stated that in the first instance, the ultimate decision on whether parties are similarly situated is a fact-bound inquiry and such is normally the grist of the jury mill. However, the court can look into whether the parties that we are seeking to be comparable are engaged in the same activity vis-à-vis the government entity and without some distinguishing circumstances under comparable circumstances. In this case, the activity that you want to compare Whiplash to with the other comparators is the act of engaging in the sale of liquor under the liquor licensing statute. Could you give us an example? We have several establishments here, all of which have liquor and entertainment. Yes, sir. And the district court found that the nature and frequency of the need for there to be police intervention at your client's club was materially different than it was at the peer-to-peer comparators. Hence, you didn't have a case that like-situated entities were being treated differently. Well, again, I think that, again, that's where the district court sort of veered in the wrong direction. Tell us why the others were alike rather than unlike your clients. Well, first let me say that none of the other clubs have had, we looked at a five-year time period, any liquor license violations. The Whiplash nightclub also did not have any liquor license violations. The violation that we're talking about that ultimately led to his suspension was ultimately overturned. We were trying to compare an event that should not have been attributed to the appellant to another. It's the same as saying that an employee goes into work and is fired one day, and the reason that they say for firing is that they live in a bad neighborhood where there's a lot of shootings. The employee comes in and says, well, it's because I'm black or Hispanic or what have you. You're not going to find any other employees there that were fired for living in the wrong neighborhood because that's not a grounds for termination or for discipline. So help me out. Are you saying that the court shouldn't have considered that there was a shooting? Correct. The court is looking back on what the government entity is doing vis-a-vis my client, the appellant. But you want the court to make an inquiry under your equal protection challenge that your client is being treated differently than others. So it really doesn't make any difference if the municipality is wrong in attributing this shooting activity that happened immediately outside the club to the club. The question is, did they do that to whiplash and not make that sort of attribution in similar circumstances to other clubs? The federal court isn't a tribunal to determine whether or not the liquor license was properly revoked. You've made a constitutional challenge. Your Honor, I think that what you said, with all due respect, is partially correct. The argument of the appellant is that the reason for the termination was pretextual. So what I think the court is supposed to look at... But that's a different issue than your equal protection issue, which is an allegation that others similarly situated were treated differently. Well, Your Honor, I think that the correct inquiry is to first look at what is the authority of the board. What's the relationship between the board and the licensees? And then look at what are other situations in which the board could act on and then say how did they treat those situations relative to whiplash. The situations would be other instances of illegalities that occur on the premises relative to, in this case, relative to violence. I think you cast the question too narrowly for equal protection purposes. The distinction you suggest might have some relevance with respect to a pretext inquiry, and you do have that kind of count in your complaint. The district court said you simply had no evidence of it. But the questions you were being asked went to the equal protection count, which was the count where the presence or absence of comparatives is determined. Your Honor, my time is running out, but I would just state that the court has said on numerous occasions that when looking into discrimination or equal protection, you're often looking into the mindset of the decision maker, which relies on circumstantial evidence. In a case like this, you have to look at the totality of the circumstances in which the board was interacting with the license holder. Okay. We're looking at them under the scope of the liquor license. Thank you, Your Honor. Good morning. I am Tom Donohue, and I represent all of the defendant appellees except for Chief Shastening. I represent the members of the Board of Selectmen and the town manager and the town of Stoughton in this case. I'd like to use my time and address three points. The first two are the first two prongs of the equal protection argument. A reasonable jury could not find that whiplash was similarly situated to any of the other bars or clubs that the plaintiff uses as comparators. The second point I'd like to argue is a reasonable jury could not find that the Board of Selectmen's actions on the licenses were motivated by racial animus. And the final point I'd like to address is the plaintiff's pretext argument as it relates to the First Amendment claim. In this case, a reasonable jury could not find that whiplash is similarly situated to any of the other bars or establishments that it compares itself to. And this court has held under the Cordiallen case that the plaintiff has to put together an extremely high degree of similarity. In this case, what was before the Board of Selectmen was within a week, so within two Saturdays in a row, there was a shooting of a 16-year-old patron across the street from Whiplash. It was a double shooting. That evidence was presented to the Board and the evidence was presented to the Board that that 16-year-old was a patron of the club. So that's two shootings. The police had already responded to whiplash because of 350-plus people engaged in fighting inside the club and outside the club. A week before that at Whiplash, a sergeant responded because of more fighting inside Whiplash and outside of Whiplash, and a woman punched the sergeant in the chest and tried to take his service weapon from him. While that sergeant then went to arrest this woman, he got a call on the radio that officers outside needed help due to all the fighting going on outside. So that officer responded outside to help with the fighting, and while that was going on and officers were arresting another woman, the woman who tried to grab the officer's gun in Whiplash came out and punched that woman in the face. There were six arrests during that time. There was other numerous, in a short period of time, with about eight months or so, numerous acts of violence at Whiplash, including someone in a parking lot, patrons running over somebody in the parking lot purposely. Boston police, the gang unit, had contacted Stoughton police and said there was a lot of gang activity here, there was a gang arrest at Whiplash, and I could go on. The district court distinguished the proffered comparators, as I understood it, based on two grounds. One, the nature of the incidents were less serious and less involved violence at the other sites. And then secondly, the court said that the other businesses were open several nights a week while Whiplash was open only two nights a week. What are we to make of the word several, and what does the record show about how often those other establishments were open? The record only shows, I think, based on the plaintiff's testimony himself, that he believed that those other clubs were primarily Caucasian and that they were open more than two nights a week, but he couldn't be more specific. So that's the only evidence in the record that they're open more than two nights. But the district court found that the violence at Whiplash is even more pronounced because they're only open Friday and Saturday nights. And the plaintiff even testified that the music or the entertainment doesn't even start until 11 and they have to clear out by 1230, so that's when everyone shows up. So this is a very narrow period of time at Whiplash for all these acts of violence to occur. So contrast that with the comparators and what was going on there. All the police activity that the plaintiff talks about was often proactive measures by the police, such as a patrol check, that means they drive by, or such as a compliance check. The officer goes in just to make sure everything's going on. Or sometimes it's a proactive measure at these other establishments that the police will just show up at closing time so there's a police presence. That's the majority of the police actions going on at the comparator establishments. So it's not violence. It's not a public concern for the safety of the patrons at these other establishments. There are also calls for lost credit cards, lost cell phones. I see my time is up, so unless anyone has any questions, I'll just rest on my brief. Thank you, Your Honors. Good morning, Your Honors, and I please the Court. Jackie Cowan for the appellate, Paul Shastry. I'll just add an answer to the judge's question. On page 91 of the supplemental, it makes an affidavit from the police chief that states that the clubs are open seven nights a week, if not seven nights a week, so that is the best evidence that we have in the record, although I do know that one of the comparators is at restaurants, which would be open more nights a week than Friday and Saturday. As to the similarly situated issue, page 9 through 11 of Shastry's brief lays out the number and nature of the incidents at Whiplash, which required police response, and the number and the nature of the incidents at the comparator clubs, to which the plaintiff compares himself. These are objective criteria that the district court applied, and it is amply evident, there is abundant support for the district court's conclusion, that the number and the severity of the incidents were so different between Plaintiff's Club and the comparator clubs as to render the comparison inutile. As Judge Cowan has said, apples and oranges they were comparing. Chief Shastry had before him, and the court has before it, undisputed evidence that during a 10-month period, in a club which was only open on Friday or Saturday nights, there were nine incidents that required a police response. All of these incidents posed a threat to public safety, many involved violence, several involved weapons, culminating with the two incidents that Mr. Donahue spoke about, ending up with a shooting, where there were two victims. Which I think has maybe gotten lost a little bit. The suspect that they eventually arrested, and one of the victims, both said that they were patrons at the club. So the issue that plaintiff has tossed out, that these incidents really did not take place at the premises, is a red herring. They involved patrons at the premises. All of the incidents involved patrons at the club, happened at closing time of the club, and took place as the district court found in or around the premises. I just want to address very quickly the statements that the plaintiff calls out in his brief that Shastry made at the license hearing. The district court got it right. These were isolated statements that he refers to, called out from a lengthy presentation by the chief, which focused on the violence at the club, and the threat to public safety that was being perused there. He told the board of selectment, I'm afraid an officer is going to get killed. The evidence amply supports that concern. To the extent that the statements convey the type of sentiment that plaintiff claims it does, that sentiment is echoed by the plaintiff himself. He stated at the licensing hearing, the trouble is because of the DJs that we have there. The district court got it right, and I would urge this court to affirm the decision. If there are no questions, I'll just rest on my brief. What are we to make of the chief's use? He referred to the clientele of the plaintiff as urban, and then there was a reference also that most of the patrons were from out of town. Does that have any, how do you respond to the plaintiff pointing to those comments? I'll take the second one first. The out of town comment was simply a factual comment. If you look at all the police reports that are in the appendix, in the supplemental appendix, if not every single one, then nearly every single one, the suspect or the patron who was arrested or involved was not from Stoughton. That was just a factual statement. And why was that factual statement relevant to the determination being made? Because in law enforcement, when we're talking about public safety concerns, when people come from other towns, whatever other towns, when they're not local, it tends to raise some concern. Why are people coming from distances to go to this club? There are clubs in the other towns and cities. Why are they coming here? And there was evidence, which the plaintiff conceded, that there was a gay presence at the club. There were gay members from, there were members of Boston Gays frequenting the club, posting about their presence at the club on social media. It was a national concern that the chief had that people from, people affiliated with gays in Boston were coming to this club in Stoughton. As to the urban clientele, I would start by adding a little bit backwards with the E.V. case. In big U.S. regards, called-for-lobber statements are not to be taken as evidence of discrimination. They do not give rise to discriminatory intent. But I would more specifically to this case say, the hearing transcript is in the record. Shastin spoke for a long time, and the officers who were with him spoke for a long time. He spoke about the violence and the public safety threat posed by the club, not the people and not the music. Thank you very much. Well, I'll be very brief. I just want to touch on a couple of things that my brothers and sisters touched on. Number one, the record is that the Whiplash Nightclub has never had any finding that they did anything to violate their liquor license. This decision that we're before this court about was appealed to the Alcoholic Beverage Control Commission and was overturned because there were no facts to support the conclusion that the Whiplash Nightclub had violated its license. What the plaintiffs are talking about, in addition to dismissing the tenor, these are not individual statements that were pulling from the chief's statements to the board. There are several statements, and the court would read the entire transcript of that hearing before the board. The entire tenor of the chief's statements were that the type of people that were coming to Whiplash were causing trouble. Not the conduct of the liquor license established, but that they're too successful in that they're bringing people that we don't want to our town here. Lastly, I'd just say that the way it appears, I think that the court is mistakenly drawing too narrow of a line by saying that we have to be exactly like all the people we're talking about. We're looking at relevant aspects relative to the relationship between the licensee and the government entity that regulates it. Thank you, Your Honor. Mr. Wilson, please give our best wishes to your spouse. Thank you. Thank you.